BUFFALO TECHNOLOGY, TOSHIBA, 2012-2009 Mr. Dana. Good morning, I'm George Dana. May it please the court. I'm here representing Suhas Wadhwa, who applied to intervene in the trial court. Mr. Dana, after six years you get a rebuttable presumption of latches. This is 15 years. Assuming you've got that rebuttable presumption, what evidence have you got to rebut it? Well, there are two parts to latches, Judge. The first part is inexcusable delay, which I'm not arguing. The other part is prejudice. Prejudice to the opposing party. Notes were destroyed? Actually, Judge, there's no evidence in this record to say that. The evidence in this record says, Dr. Wadhwa said that when he left the University of Texas in 1988, he left his research notes at the university. Dr. Collins, by affidavits, swore that he did not have them, and he also was no longer at the University of Texas. But those two statements do not equate to the research notebooks have been lost. The University of Texas still exists. Presumably the notebooks can be obtained. But Judge, more to the point, and I know you have a comment, Suhas Wadhwa left the University of Texas in 1988. His own 007 patent did not issue until 1991. The patents in litigation issued four years later in 1995. So the argument that his delay has caused the loss of these notebooks is not actually accurate. He had left them at the University of Texas in 1988. If he had filed suit to correct inventorship the day the patents in suit had issued, the facts would be the same. Well, a time, another, what, 16 years, something like that passed? I mean, how much more time passed between your later date? Well, I agree, Judge. The passage of time obviously works against him. But to say conclusively on the pleadings that the notebooks have been lost to time is not accurate. The record does not support that. Additionally, Judge… Well, that may be true, but what strikes me is we've got to take account of the burden of production and the burden of proof. And in our in-bank decision in this area, we've said that the burden of showing prejudice is on the patent holder, but that the burden of going forward is on you. And to be sure, you have shown that the named inventors are still alive. This is not a situation in which they've died. They're still alive. But, so the focus is, as Judge Walsh is suggesting, is on the notebooks. And who has the burden of showing what's going on with respect to the notebooks? Do you have the burden of showing that the notebooks still exist, or do they have the burden of showing that the notebooks do not exist? Well, I think the burden of going forward, when the issue is raised, the presumption would suggest that we have the burden of going forward. But the ultimate burden of persuasion is on the parties opposing our intervention. Well, don't you have a problem, then, because you haven't gone forward, you didn't ask for discovery of the University of Texas as to whether they have the notebooks. Isn't that something that you were obligated to do, to bring in evidence that the notebooks still exist? I don't think so, Judge. And the reason I would argue we did not is, at this stage of the proceedings, we never got in the door. Our motion to intervene was denied. Now, I would suggest that you can almost analogize it to summary judgment practice. If we raise an issue, I think we should be permitted into the case, and then the intervention tried, where the things you suggest would be relevant. This isn't just a notebook case. This is, what, depending upon what you count from 13 to 15 years, and a holding of, essentially, a latent denial of a motion to intervene. I mean, there's got to be an awfully high standard to overcome that. Well, I don't know that it is, Judge. As I say, the courts have held, this court has held, that there is no diligence requirement to file a suit to correct inventorship. The latches require that they prove that they have been prejudiced by our delay. Now, the Fifth Circuit has held, and this court has held that in matters that are not unique to patent law, we'll apply the regional circuit rule. The Fifth Circuit has held that for the purpose of passing upon a party's right to intervene, the well-pleaded, non-conclusory allegations of the motion to intervene should be taken as true. So, at this stage of the proceedings, where we present our motion, and we offer, and by pleadings, we allege facts that suggest there has been no prejudice to the defendant, our argument is, at that stage of the proceedings, that allegation should be taken as true. Until somebody comes forward with a demonstration that, in fact, they've been prejudiced. If it were conclusively shown, I would agree. Again, analogizing it to summary judgment practice. That did not occur in this case. Suhas Wagle testified, when I left my notebooks there, Dr. Collins testified, I don't have them. That does not mean they're not recoverable. And to suggest that we have to prove our intervention… There's lots more than those notebooks. With the passage of time, there's evaporation of memory. And there was discussion of other aspects than the notebooks, wasn't there? Wagle said that he had his Ph.D. dissertation, where he could prove that he had come up with these concepts before he ever worked at the University of Texas. He alluded to the publication of two papers, again, before he ever came to the University of Texas. He was a co-inventor on the earlier patents. Yes, and actually, Judge, he was the first. On the 007 patent. Yes, the first patent. What we call the parent patent. He really was the originator of that idea, and he was the first named inventor on the 007 patent. These latter patents even acknowledge, in the summary description of the patents, they even acknowledge that that method and apparatus of the 007 patent is capable of producing nanophase diamonds. Of course, being the first named inventor isn't necessarily significant to a lot of… I understand. …company employers who do it differently. I do. As a matter of law, I agree with that. I think as a matter of custom and practice, it is an honor that is usually bestowed on the primary mover in the creation of the patent. Judge, I know I have more time. If I've answered your questions, I'll sit down. No one ever gets penalized for not using all of his time. Well, I didn't think you would do that, so I'll give you back some of your time. I may want to reserve some for everybody. I want you to know it's an honor to be here. Thank you. Mr. Latham. Thank you, Your Honor. As the court cautioned in the Eli Lilly case, there's a strong temptation for persons to reconstruct the extent of their contribution to further their own position, and we believe that this is a classic case of that. Well, it may or may not be, but that's not really the issue before us. The issue is whether they should have been permitted to intervene to try to make their case for inventorship, and you have the burden of proof on the issue of prejudice, correct, to show prejudice? No, we don't, Your Honor. Once we have established that there's a six-year delay from when the would-be intervener knows or should have known that he has a cause of action, the burden of production shifts to the intervener to come forward with evidence as to why there is no prejudice. So that's the stage we are at now. I agree with you that ultimately the burden of proof, if you will, is on the person invoking latches, but that burden is shifted to a burden of production when the delay is longer than six years. Have we held that there's a presumption of prejudice after six years? Yes, it's a rebuttal presumption, but you have held that. I believe Mr. Garbage's case is one such case where that's been stated, which is in our brief. And I think what makes this case a unique and compelling case of latches is that there really is no factual dispute, as some of the other cases that this court has considered. There really is a factual dispute as to whether these notebooks still exist or not, and the record doesn't tell us the answer to that, right? I guess the record doesn't tell us whether they exist somewhere. What the record tells us is that they do not exist in this Department of the University of Texas. How do we know that? From the declaration of Dr. Collins. What does he say? Tell me that. I can read it, but he says that notebooks do not exist. I don't recall him saying that notebooks don't exist. Well, let me be more precise in my language. I think what he says is that he doesn't have the notebooks and doesn't know where they are. Okay, well that's rather different from saying they don't exist. Yes, Your Honor. We can't tell from the record whether they exist or they don't exist. That's correct, but I think as was observed by this court, the notebooks really don't matter. This isn't just about the notebooks. This is about the passage of time. Well, you have a problem if you say the notebooks don't matter, because if they don't matter, then their possible destruction shouldn't be taken into account on the prejudice question. But that's my point. Even if you discount the notebooks on the question of prejudice, the burden is on them to show no prejudice. And they still haven't shown no prejudice, even getting rid of the issue of the notebooks. Well, they've shown that the named inventors are still alive. They can testify. But as this court suggested in Sardarovich, when you have a delay this long, it's inevitable that memories are going to fade and the memories certainly won't be as vivid. What case says that the mere possibility that memories would fade is sufficiently show prejudice? Well, Sardarovich says that that is why the rebuttable presumption exists, is because it is presumed that memories will fade. What would Langhor, or whatever his name is here, have to show to rebut the presumption of prejudice? I think it would be a… He's shown that the witnesses are still alive. He's shown that the inventors are still alive. Yes. He hasn't shown that anybody connected with the development of these patents is still around and available. He hasn't shown that, for instance, tests or not just notebooks but other records are still available, that production material is still available. Now, Dr. Wagel had to assign any interest he had to the university, right? That's correct. So, in that sense, that weakens his standing to intervene, but would he have obtained any monetary benefit from being an inventor? From being an inventor of these patents? These patents. The 797 and 650 patents. If he had been a named inventor and if the university, in assigning back the patents to Dr. Collins and Dr. Davenport, had also assigned the patents to Dr. Wagel, then yes, he would have been able to be part of the commercialization agreement that was ultimately signed. Were these patents commercialized? That's what the underlying lawsuit is about, is the commercialization of the patents. If I might get back to why I think this is a fairly unique and compelling case of latches, and what I meant when I said there's no factual dispute, there's no factual dispute as to when Dr. Wagel learned of these patents. In some of the other cases the court has had to consider in the field of latches, there's been a dispute about whether they knew the patents were issued, whether they had an attorney, all these sorts of things. Here, we know from public records that he knew the patents existed going back to 1995. We know that in 1997 he had the same attorney asserting the same arguments that are being asserted here in the context of a proceeding through the University of Texas' own internal procedures as to how the contributions of the patents and how they would be allocated looking forward to commercialization. There's no issue here as to the date when he knew or should have known. Thus, the idea that there should have been a time for discovery or it's premature to consider this in the context of intervention really doesn't exist here. That's why we think that the Fifth Circuit cases of Crowley Maritime and the Atkins case in which the court denied intervention because it was clear that the statute of limitations applied are very analogous to this situation. Did he request discovery? No, he did not. Not at all. There was one year between the time of his filing the motion and the time of the hearing, so he would have had a year when he could have made such a request. Why would the university sign back commercially valuable patents to the inventors? Well, I can answer that question. It's not necessarily in the record. Right, I understand. But from 1995 to 2001, pursuant to employment agreements with the inventors, the university had them. The university thought that the patents might have some value. Universities really aren't in the position of maximizing that value. They thought that they could incentivize the inventors to commercialize them and enter into a commercialization agreement where a certain percentage of what the inventors were able to obtain would go back to the university. That happened in 2001. And by the way, I heard Mr. Dana say that they're not standing on excusable delay, so I don't know that I need to address that, but I will state that for purposes of the Zchem case that was raised, and that may be out of the case since they're not on excusable delay, but the inventors themselves had the patents as of 2001, so the whole issue of sovereign immunity that was raised in the briefing really doesn't come into play since he's not standing on excusable delay. Your Honor, I want to just briefly mention an alternative ground other than laches. As this Court is aware, the Court can affirm on anything that is supported by the record. Mr. Dana made the statement that, kind of analogizing this to a summary judgment case or a Rule 12b-6 case where just look at the pleadings and take everything there as true, you could look at his motion for intervention and take everything there as true and still reach the same result. All Dr. Waddell ever stated in his motion for intervention is that I'm the co-inventor of the 007 patent, the 797 and 650 patents are continuations in part, ergo I should have been a named inventor, and the patent law doesn't support that. These are continuations in part. They are continuations in part. In other words, it's added subject matter. A different subject matter was added and claimed and the inventors never claimed the priority date of the 007 patent because of that fact. So he never comes forward at any time and says here's what I contributed to that claim of these patents. His entire argument is these are continuations in part of a patent that I was a co-inventor on and nothing in patent law or case law supports that. And that's just looking at it from what he's put forward. We, in response to the motion to intervene, came forward with a significant amount of evidence that showed why he couldn't state that he contributed the claims because he didn't. We pointed out the difference in the claims. We pointed out the difference in the method used to produce these compositions, a different method than the method claim of the 007 patent. No objection was made to that evidence. They tried to throw in some arguments and some counter evidence. So even if this court is not inclined to affirm on latches, and I do think for the reasons we've discussed, affirming on the ground of latches is appropriate, but it can affirm on the grounds that Dr. Waddle has no protectable interest here, which the court didn't reach but which we think the record supports both based on… If he's a co-inventor on a patent that has commercial value, why isn't that a protectable interest? Well, if we were bringing suit on the 007 patent, which has expired, so we're not, and if he hadn't been named, if he's trying to correct inventorship of that patent, then sure, he can come in, but he has no interest in these patents because these patents added subject matter and claims two years after he'd left the University of Texas and moved to India. He wasn't around. There was no collaborative effort. There was no open line. It's not impossible that his prior work contributed to the later patents, right? We don't know that. Yes, we do because it's in the evidence that we presented, and he never asserts that it did. He just says the 007 patent, I contribute to it as a continuation part, but he doesn't identify what claims in the 797 and 650 patents he had anything to do with or his work had anything to do with. So that's why it's distinguishable from the Falana case, for instance, that this court considered this last summer. Your Honor, I think I'll give back the court some time as well, unless there are any further questions for me. Thank you, Mr. Latham. Mr. Dana has rebuttal time if he wishes to rebut. I just want to make a couple very brief points, and I appreciate it. This court issued an opinion in 1993. It's Advanced Cardiovascular vs. PsyMed Life, in which the court said that the facts evidencing unreasonableness of the delay, lack of excuse, and material prejudice to the defendant cannot be decided against the complainant based solely on the presumptions. If that is still good law in this court, then the door to Dr. Wagle's intervention should have been open. The last thing I want to mention is the Falana case that Mr. Latham referenced. This year, this court issued Falana vs. Kent State, in which it said it held that the contribution to the method by which to make novel compounds, in that case chemical compounds, in this case diamond-like films, the method by which to make novel compounds entitled an inventor to a subsequent claim covering that compound, where the method requires more than the exercise of ordinary skill, the discovery of that method is as much a contribution to the compound as the discovery of the compound itself. Analogizing that to this case, Dr. Wagle discovered the method by which to make nanophase diamond film. The fact that his method was later used to come up with a diamond film that had different characteristics under Falana, he'd be entitled to be named as a co-inventor. And I do appreciate the time. Thank you, Mr. Day. Thank you, Jeff. This case will be taken under review.